# EXHIBIT "A"

# AGREEMENT AMONG SHAREHOLDERS
OF
# VISION PLASTICS MANUFACTURING, INC.,
A California Corporation

THIS AGREEMENT AMONG SHAREHOLDERS ("Agreement" or "Shareholder's Agreement") of Vision Plastics Manufacturing, Inc., a California corporation is made and entered into as of November __4__, 2014, by and between Vision Plastics Manufacturing, Inc., a California corporation (the "Company"), and CHRISTIAN SORENSEN, STEPHEN RHOADS, JON KEMMER, and ROBERT MILLER (collectively the "Shareholders" and individually a "Shareholder").

RECITALS:

This Agreement is made with reference to the following facts:

A. The Shareholders have formed the Company for the purpose of manufacturing and all types of business incidental thereto. The Company will also do business under the "fictitious name" of "SNAPO" in connection with its manufacturing and incidental business.

B. The Company was incorporated as a California corporation on May 22, 2012. The Company has authorized capital consisting of one hundred (100) shares of common stock.

C. The Shareholders are desirous of entering into this Agreement for the purpose of setting forth their respective rights and duties in connection with the formation and operation of the Company and the financing, management and operation and continuity of its business.

D. This Agreement shall supercede any prior shareholder's agreement.

NOW, THEREFORE, it is agreed as follows:

1. Principal Office.

The Company shall have its initial principal office at 9888 Waples Street, Suite B, San Diego, California 92121.

2. Directors.

The Company shall have a Four (4) person Board of Directors (the "Board") consisting of the following persons who shall serve until replaced: CHRISTIAN SORENSEN, STEPHEN

RHOADS, JON KEMMER, and ROBERT MILLER.

3. Officers.

Until changed by any regular or special meeting of the Board, the persons and designations filed with the Secretary of State shall be the duly constituted officers of the Company until changed by the Company Board of Directors.

4. Purchase of Stock.

Each Shareholder hereby agrees to purchase the number of shares of the Company's 100 shares (or equivalent proportion) of Common Stock (the "Shares") for the consideration indicated below. All shares referenced above shall also be interpreted to represent an equivalent equity or percentage ownership of the Company.

5. Consideration.

A. Shareholder - CHRISTIAN SORENSEN
No. of shares: 27.666

Property: machinery, equipment, tools, plans, diagrams, maps, manuals, writings of any and all kinds, including but not limited to "SNAPO" molds and injection molding machines and an exclusive license to use all related United States patents for a period equal to the duration of the Company's existence, and a license of all related foreign patents, as further set forth below.

Total: $300,000.00

In addition, Shareholder Christian Sorensen has given to the Company an unsecured personal loan of One Hundred Thousand Dollars ($100,000.00) represented by a note bearing an interest rate of 5% with principal and interest due at a time when the Company is able to repay the loans as determined by the resolution of the Company Board of Directors.

B. Shareholder - STEPHEN RHOADS
No. of shares 27.666

Cash Total: $300,000.00

In addition, Shareholder Stephen Rhoads has give to the Company an unsecured personal loan of One Hundred Thousand Dollars ($100,000.00) represented by a note bearing an interest rate of 5% with principal due at a time when the Company is able to repay the loans as determined by resolution of the Company Board of Directors.

C. Shareholder - JON KEMMER
No. of shares 27.666

Cash Total: $150,000.00

Amcor Account: $150,000 Account Amcor 401k rollover facilitated by Guardian Financial

Total: $300,000.00

D. Shareholder - ROBERT MILLER
No. of shares 17.0

Cash Total: $400,000.00

1. ROBERT MILLER is granted a non exclusive right to purchase an additional Eight (8) shares of the Company equivalent to eight percent of the ownership of the company. Robert Miller will be required to make payment if he exercises his option to purchase said shares on or before 11:59 p.m., September 4th, 2015. Robert Miller agrees to purchase the additional shares representing additional ownership interest for the sum of Two Hundred Thousand Dollars ($200,000.00).

2. Prior to payment by ROBERT MILLER, if a third party opts to purchase the same interest offered to Robert Miller, said offer shall be made in writing and delivered to Robert Miller, who then shall have the right to match any third party offer to purchase the Eight (8) shares within sixty days of the delivery of the third party offer to Robert Miller.

3. If the payment by ROBERT MILLER is made, then each shareholder, CHRISTIAN SORENSEN, STEPHEN RHOADS, JON KEMMER, and ROBERT MILLER, will thereafter own twenty five per cent (25%) of the total shares of the Company, representing an equivalent ownership interest in the Company. If the payment is not made, then the ownership interest shall remain as set forth above, subject to any future changes provided for in this Agreement.

6. Salaries.

Any salary shall be determined by the board of directors of the Company.

7. Right of First Refusal.

Neither any Shareholder, nor his heirs, personal representative, successors, or assigns, shall have

the right, at any time, to sell or transfer any portion of his shares purchased hereunder unless:

(a) The shares are offered to the Company after the date of September 4, 2015.

The selling Shareholder shall deliver a written notice to the Company, stating the price, terms, and conditions of the proposed sale or transfer, the shares to be sold or transferred, and the identity of the proposed transferee ("Seller's Notice").

Within thirty (30) days after receipt of the Seller's Notice, the Company shall have the right to purchase all or any portion of the shares so offered at the price and on the terms and conditions stated in the Seller's Notice.

(b) The shares are offered to Other Shareholders.

If the Company fails to purchase all of the Shares specified in the Seller's Notice, and if the Company has not then made an initial public offering of its Common Stock, the following procedure shall be followed with regard to any sale or transfer of Shares. The Company shall, at the expiration of twenty-one (21) days after receipt of the Seller's Notice, notify each of the Shareholders of the total number of Shares not purchased by the Company, enclosing a copy of the Seller's Notice (the "Company's Notice").

Each of the Shareholders shall have sixty (60) days after the mailing of the Company's Notice to notify the selling Shareholder in writing of his intention to purchase all or any specified portion of the available Shares described in the Company's Notice on the terms and conditions set forth in the Seller's Notice.

Each Shareholder shall deliver to the selling Shareholder by mail or otherwise a written offer or offers to purchase all or any specified portion of the selling Shareholder's Shares remaining for sale ("Shares for Sale") on the terms described in the Seller's Notice. Each Shareholder shall be entitled to purchase the proportion of the Shares for Sale at the ratio that his Shares bear to the total Shares held by all Shareholders desiring to purchase Shares for Sale.

If the total Shares specified in the offers received within such period by the selling Shareholder exceed the Shares for Sale, each Shareholder desiring to purchase a percentage of the Shares for Sale in excess of his proportionate share shall be entitled to purchase the proportion of the Shares for Sale that remains thus undisposed of, at the ratio that his Shares bear to the total Shares held by all of the Shareholders desiring to purchase shares in excess of those to which they are entitled under such prior apportionment.

THIS FORMULA DOES NOT USE THE TOTAL SHARES OUTSTANDING IN ITS CALCULATION--IT IS THE TOTAL OF A PURCHASING SHAREHOLDER'S SHARES DIVIDED INTO THE TOTAL OF ALL THE SHARES OWNED BY THE PURCHASING SHAREHOLDERS. ONLY AFTER THE PERCENTAGE IS

DETERMINED FOR EACH PURCHASING SHAREHOLDER IS IT APPLIED TO THE TOTAL AMOUNT OF THE OFFERED SHARES. THUS, THE SHARES BEING OFFERED FOR SALE ARE NOT INCLUDED IN THE FORMULA OR EQUATION THAT ARRIVES AT THE PERCENTAGE OF EACH SHAREHOLDER'S PURCHASE RIGHT TO THE OFFERED SHARES.

EXAMPLE 1 - FOR DISCUSSION PURPOSES ONLY

IN OTHER WORDS, IF ALL THE REMAINING SHAREHOLDERS WANT TO PURCHASE 25 OFFERED SHARES, THEY DO SO IN THE PERCENTAGE THAT THEIR SHARES BEAR TO THE THE TOTAL. HENCE, IF THE REMAINING SHAREHOLDERS OWN 25% EACH, EACH BUY ONE THIRD OF THE 25 OFFERED SHARES, THE PERCENTAGE WOULD BE 33.333% FOR THE PURCHASE OF ALL THE OFFERED SHARES.

EXAMPLE 2 - FOR DISCUSSION PURPOSES ONLY

27.666 SHARES OFFERED BY SHAREHOLDER A FOR SALE

27.666 SHARES OFFERED BY SHAREHOLDER B FOR SALE

55.332 TOTAL SHARES OFFERED

SHAREHOLDER C (27.666%) AND SHAREHOLDER D (17.0%) BOTH WANT TO PURCHASE AS MUCH OF THE 55.332% OF SHARES OFFERED AS POSSIBLE.

C'S PERCENTAGE OF SHARES TO ALL PURCHASING SHAREHOLDERS IS A PERCENTAGE OF 27.666 TO 44.666 (27.666 +17.0) OR 61.939% OF THE 55.332 SHARES OFFERED.

D'S PERCENTAGE WORKS OUT TO 17.0 OF 44.666 OR 38.060% OF THE 55.332 SHARES OFFERED.

THIS FORMULA DOES NOT USE THE TOTAL SHARES OUTSTANDING IN ITS CALCULATION--IT IS THE TOTAL OF A PURCHASING SHAREHOLDER'S SHARES DIVIDED INTO THE TOTAL OF ALL THE SHARES OWNED BY THE PURCHASING SHAREHOLDERS. ONLY AFTER THE PERCENTAGE IS DETERMINED FOR EACH PURCHASING SHAREHOLDER IS IT APPLIED TO THE TOTAL AMOUNT OF THE OFFERED SHARES. THUS, THE SHARES BEING OFFERED FOR SALE ARE NOT INCLUDED IN THE FORMULA OR EQUATION THAT ARRIVES AT THE PERCENTAGE OF EACH SHAREHOLDER'S PURCHASE RIGHT TO THE OFFERED SHARES.

(c) Transfer to Third Parties.

If none or only a part of the Shares for Sale is bid for purchase by the other Shareholders, then the selling Shareholder may dispose of the remaining Shares for Sale to any person or persons but only within a period of one hundred eighty (180) days from the date of the Seller's Notice. However, the selling Shareholder shall not sell or transfer any of the Shares for Sale at a lower price or on terms more favorable to the purchaser or transferee than those specified in the Seller's Notice. After the one hundred eighty (180) day period, the procedure for first offering to the Company and other Shareholders shall again apply.

(d) Transfer by Gift or at Death.

The requirement of this paragraph that no transfer of the Shareholder's Shares shall be valid until it is first offered to the Company and other Shareholders shall not apply to transfers by inter vivos gift or by intestate succession or testamentary disposition on the Shareholder's death. This shall include transfers of interest to the Shareholders' personal trusts. However, any such transfer by the donee, estate, representative, or beneficiary must be made in accordance with the provisions of this paragraph.

(e) Term of Restriction.

The provisions of this paragraph shall cease and terminate and have no further force or effect upon the expiration of ten (10) years from and after the date of this Agreement, unless there is a Resolution of the Company Board of Directors to continue the Company (and in that instance for the term of that continuance) or earlier upon public offering of the Company's stock or if the Company is acquired by merger, sale of assets, sale of stock, or otherwise; and thereupon any Shareholder's stock shall be freed of and from all restrictions upon its sale and transfer imposed under this Agreement; and any certificates then outstanding representing Shareholder's stock so freed, shall be reissued by the Company without any such restrictive legend.

(f) Exemption.

Robert Miller's option to purchase an additional eight per cent (8%) of the Company's Common stock described in Paragraph 5 D of this Agreement is separate and an exemption from the above requirements.

8. SNAPO Licenses/Patents.

8.1 Christian Sorensen currently owns certain patents and technologies for the manufacture of SNAPO products. He hereby grants and gives an exclusive license to those patents and technologies for North America (Canada, Mexico and U.S.A.) to Vision Plastics Manufacturing, Inc. However, this exclusive license may be altered or terminated by grantor if Vision Plastics Manufacturing, Inc. files for bankruptcy, or otherwise ceases normal operations of manufacturing and sales of SNAPO products, and in such circumstance Christian Sorensen would retain the opportunity to receive contributions towards his patent costs from third party licensees.

8.2 Christian Sorensen will receive from Vision Plastics Manufacturing, Inc. payment of five (5%) percent of all of the net invoice sales Company SNAPO product sales that occur within North America (Canada, Mexico and U.S.A.). These amounts are to be paid to Christian Sorensen quarterly following the quarter that the sales occurred. The license of the SNAPO manufacturing technologies and patents are exclusive to Vision Plastics Manufacturing, Inc. for North America only.

As to the use of technologies and patents outside of North America, Christian Sorensen will not grant such a license or assignment to any other person or entity other than the Company, nor make an assignment to any other person or entity, without first offering the technology and patents to Vision Plastics Manufacturing, Inc. under the provisions of the right of first refusal procedures In paragraph 7 (a) of this Agreement.

8.3 Notwithstanding the above, until such right of first refusal for license or sale of rights outside of North America becomes operative, Christian Sorensen shall assign or license to Vision Plastics Manufacturing, Inc. a temporary right to sell SNAPO products to subsidiaries outside of North America. For those outside sales, Christian Sorensen, shall receive from the Company five (5%) percent royalty calculated and paid quarterly in the manner set forth above.

8.4 Christian Sorensen, his heirs, issues and assigns, shall maintain at their expense all applicable SNAPO patents. Christian Sorensen may continue to apply for new patents, and he will pay for the associated application and maintenance costs, as such new patent applications and issued patents will be owned by Christian Sorensen.

8.5 Christian Sorensen has the right to abandon existing patents that he owns by not continuing to pay the maintenance costs/renewal fees, however if Christian Sorensen decides to "abandon" any existing patents, he shall first notify the Company at one hundred eighty (180) days prior to any relevant respective patent expiration date. In that case, the Company shall receive an assignment of the ownership over any such U.S. patents abandoned by Christian Sorensen by paying the associated costs/maintenance fees. The Company shall receive a full assignment and transfer of all ownership right from Christian Sorensen and the Company assumes the cost of maintaining the assigned patents.

Any assignment of ownership to the Company shall not affect the 5% royalty payment to be paid to Christian Sorensen from Company sales of SNAPO products, as set forth above.

9. Legend on Stock Certificate.

Each certificate representing shares of stock owned by each Shareholder shall have an endorsement on its face (in addition to any restrictive legend required by the Commissioner of the California Department of Business Oversight), a legend substantially in the following form:

THIS CORPORATION IS A CLOSE CORPORATION.

THIS CORPORATION IS A CLOSE CORPORATION. THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE TRANSFERRED, SOLD, PLEDGED, HYPOTHECATED, OR

OTHERWISE DISPOSED OF EXCEPT IN ACCORDANCE WITH THAT ACT AND IN ACCORDANCE WITH AN AGREEMENT AMONG SHAREHOLDERS, A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY.

10. Termination.

This Agreement shall remain in effect until: (I) the Company is merged into, or sells its assets to, or exchanges stock with, another corporation as to which transaction the shareholders of the Company will hold less than fifty percent (50%) of the issued and outstanding stock of the surviving corporation on a fully diluted basis; (ii) a public offering of the Company's securities is effected; or (iii) the expiration of ten (10) years from the date of this Agreement, whichever occurs first.

11. Trade Secrets and Unfair Competition.

It is understood that the business of the Company is unique and its development is dependent upon the services of CHRISTIAN SORENSEN, STEPHEN RHOADS, JON KEMMER, and ROBERT MILLER as key employees, directors, and shareholders of the Company. It is further understood that in the course of rendering services to the Company in any capacity, CHRISTIAN SORENSEN, STEPHEN RHOADS, JON KEMMER, and ROBERT MILLER will have access to the Company's confidential and proprietary information and trade secrets, including technical, financial and marketing data, customer lists, and other items of proprietary information (collectively called "Confidential Information"). The use of Confidential Information or the solicitation of the Company's clients or use of information after termination of his employment, sale of shares, or when no longer affiliated with the Company would materially and adversely affect the Company and all of the shareholders economically and otherwise.

Accordingly, as an inducement to acquire stock in the Company, CHRISTIAN SORENSEN, STEPHEN RHOADS, JON KEMMER, and ROBERT MILLER each agree for a period of three (3) years from and after the date of termination of his involvement or employment, not to directly or indirectly divulge, sell, transfer, or utilize any Confidential Information to or for the benefit of any person, firm, or corporation without the Company's prior written consent, or to solicit any of the Company's employees or customers for a period of three (3) years from the date of his termination as a shareholder, director or officer.

12. Miscellaneous Provisions.

(a) Entire Agreement.

This Agreement embodies the entire agreement and is a final, complete, and exclusive statement and understanding between the parties with respect to the subject matter and supersedes all prior

agreements and understandings relating to such subject matter.

(b) Notices.

Any notice under this Agreement shall be deemed sufficiently given by one party to another if in writing and if and when delivered or tendered either in person or by the deposit of it in the United States mail, in a sealed envelope, registered or certified, with postage prepaid, addressed to the person to whom such notice is being given at such person's address appearing on the records of the Company or such other address as may have been given by such person to the Company for the purposes of notice in accordance with this subsection. A notice not given as above shall, if it is in writing, be deemed given if and when actually received by the party to whom it is required or permitted to be given.

(c) Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of California.

(d) Successors.

Anything in this Agreement to the contrary, notwithstanding any transferee, successor, or assignee, whether voluntary, by operation of law, or otherwise, of the shares of the Company's Common Stock shall be subject to and bound by the terms and conditions of this Agreement as fully as though such person were a signatory. This Agreement shall be binding upon the parties, their heirs and assigns.

(e) Further Assurances.

Each of the Shareholders agrees that, during the term of this Agreement, the Shareholder will take such reasonable actions as may be necessary to effect the purposes of this Agreement.

(f) Severability.

Any provision of this Agreement prohibited by, or unlawful or unenforceable under, any applicable law of any jurisdiction shall, as to such jurisdiction, be ineffective, without affecting any other provision of this Agreement. To the full extent, however, that the provisions of such applicable law may be waived, they are hereby waived to the end that this Agreement may be deemed to be a valid and binding agreement enforceable in accordance with its terms.

(g) Remedies.

The parties to this Agreement shall have available to them all remedies for breach provided by law or equity. Without limiting the generality of the foregoing, the parties agree that, in addition to all other rights and remedies available at law or in equity, the parties shall be entitled to obtain specific performance of the obligations of each party to this Agreement and immediate injunctive relief and that in the event any action or proceeding is brought in equity to enforce the same, no Shareholder will urge, as a defense, that there is an adequate remedy at law.

(h) Acknowledgment of Attorney Representation and Joint Drafting.

Each of the Shareholders acknowledges that Curtis J. Morris has acted as attorney for the Company in connection with the drafting of the corporate documents; that each of the other Shareholders has been advised to seek independent representation by counsel of his own choice; and that each of the Shareholders is not relying upon Curtis J. Morris to act as his personal attorney in connection with any matter relating to this Agreement. All the Parties hereto have reviewed and participated in the drafting of this Agreement, and agree that any rule of construction to the effect that any ambiguity in the interpretation of this agreement is to be resolved against the drafting party shall not apply. This Agreement shall be construed as if drawn and prepared by all Parties hereto jointly. Any uncertainty and ambiguity shall not be interpreted for or against any one party.

VISIONS PLASTICS MANUFACTURING, INC.

By: ______________________
CHRISTIAN SORENSEN, President

Attested: ______________________
JON KEMMER, Secretary

Dated: November 10, 2014

______________________
CHRISTIAN SORENSEN

Dated: November 6, 2014

______________________
STEPHEN RHOADS

Dated: November 4, 2014

JON KEMMER

Dated: November 10, 2014

ROBERT MILLER

## CONSENT OF SPOUSE

I, Skye Miller, the spouse of ROBERT MILLER acknowledge that I have read the foregoing Agreement Among Shareholders dated November 10, 2014 (the "Agreement"), by and among the shareholders and Vision Plastics Manufacturing, Inc. (the "Company") and my spouse, and that I know its contents. I am aware that by the provisions of the Agreement, the Company and the other Shareholders may buy all of the Common shares (as defined in the Agreement) which my spouse owns, including any interest I might have in the Shares, and I am aware that certain other restrictions are imposed on the sale or other disposition of the Shares.

I hereby agree to be bound by the Agreement and acknowledge and agree that my interest, if any, in the Shares is subject to the Agreement and shall be irrevocably bound by the Agreement, and I further understand and agree that any community property interest I may have in the Shares shall be similarly bound by the Agreement. I am aware that the legal, financial, and related matters contained in the Agreement are complex, and that I am free to seek independent guidance or counsel with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I waive such right.

Dated: 11/10/, 2014

Skye Miller

## CONSENT OF SPOUSE

I, CAROL SORENSEN, the spouse of CHRISTIAN SORENSEN, acknowledge that I have read the foregoing Agreement Among Shareholders dated November____, 2014 (the "Agreement"), by and among the shareholders and Vision Plastics Manufacturing, Inc. (the "Company") and my spouse, and that I know its contents. I am aware that by the provisions of the Agreement, the Company and the other Shareholders may buy all of the Common shares (as defined in the Agreement) which my spouse owns, including any interest I might have in the Shares, and I am aware that certain other restrictions are imposed on the sale or other disposition of the Shares.

I hereby agree to be bound by the Agreement and acknowledge and agree that my interest, if any, in the Shares is subject to the Agreement and shall be irrevocably bound by the Agreement, and I further understand and agree that any community property interest I may have in the Shares shall be similarly bound by the Agreement. I am aware that the legal, financial, and related matters contained in the Agreement are complex, and that I am free to seek independent guidance or counsel with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I waive such right.

Dated: 11/10, 2014

[signature]
______________________________

## CONSENT OF SPOUSE

I, MARIA RESURRECCION JIMENEZ, the spouse of STEPHEN RHOADS acknowledge that I have read the foregoing Agreement Among Shareholders dated November ____, 2014 (the "Agreement"), by and among the shareholders and Vision Plastics Manufacturing, Inc. (the "Company") and my spouse, and that I know its contents. I am aware that by the provisions of the Agreement, the Company and the other Shareholders may buy all of the Common shares (as defined in the Agreement) which my spouse owns, including any interest I might have in the Shares, and I am aware that certain other restrictions are imposed on the sale or other disposition of the Shares.

I hereby agree to be bound by the Agreement and acknowledge and agree that my interest, if any, in the Shares is subject to the Agreement and shall be irrevocably bound by the Agreement, and I further understand and agree that any community property interest I may have in the Shares shall be similarly bound by the Agreement. I am aware that the legal, financial, and related matters contained in the Agreement are complex, and that I am free to seek independent guidance or counsel with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I waive such right.

Dated: 11/10, 2014

______________________________

## CONSENT OF SPOUSE

I, Susan C Kemmer, the spouse of JON KEMMER acknowledge that I have read the foregoing Agreement Among Shareholders dated November 4, 2014 (the "Agreement"), by and among the shareholders and Vision Plastics Manufacturing, Inc. (the "Company") and my spouse, and that I know its contents. I am aware that by the provisions of the Agreement, the Company and the other Shareholders may buy all of the Common shares (as defined in the Agreement) which my spouse owns, including any interest I might have in the Shares, and I am aware that certain other restrictions are imposed on the sale or other disposition of the Shares.

I hereby agree to be bound by the Agreement and acknowledge and agree that my interest, if any, in the Shares is subject to the Agreement and shall be irrevocably bound by the Agreement, and I further understand and agree that any community property interest I may have in the Shares shall be similarly bound by the Agreement. I am aware that the legal, financial, and related matters contained in the Agreement are complex, and that I am free to seek independent guidance or counsel with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I waive such right.

Dated: 11/4, 2014

Susan C. Kemmer