# EXHIBIT "C"

Original

# SETTLEMENT AND LICENSE AGREEMENT

This SETTLEMENT AND LICENSE AGREEMENT ("Agreement") is entered into effective as of the latest date set forth on the signature page hereof ("Effective Date") by and between Snapo Toys, LLC ("Licensee"), a limited liability company organized in Pennsylvania and having an address of 105 West 9th Street, Shoemakersville, PA 19555, and Carol Sorensen ("Licensor"), having an address of 13404 Kibbings Road, San Diego, CA 92130, each being a "Party" and collectively the "Parties". For purposes only of the provisions specifically addressing settlement and release of claims, the Estate of Soren Christian Sorensen, Tara Kennedy-Kline, and Multi-Level Mom, LLC further are parties to this Agreement.

WHEREAS, Licensor owns all rights, titles, and interests in certain patents and technologies for the manufacture of Snapo brand products, including the intellectual property of the attached Intellectual Property Schedule ("IP");

WHEREAS, Licensor is the owner of U.S. trademark registration no. 4,419,358 for SNAPO ("Snapo Trademark Registration"), the Snapo.com domain, and other marks relating to Snapo, and the goodwill associated therewith (collectively the "Snapo Brand");

WHEREAS, the Parties are litigants in the pending action entitled *Sorensen v. Vision Plastics Manufacturing, Inc., et al.*, Case No. 19-CV-00738 DMS MDD (S.D. Cal.) (the "Action"); and

WHEREAS, to avoid further expenditure of time, costs, and fees, the Parties desire to compromise, resolve and settle any and all actual, threatened and potential claims and disputes between them arising from or related to the Action; and

WHEREAS, Licensee desires to obtain an exclusive license to develop, make, produce, market, sell, offer for sale, use, import, and distribute articles protected by the IP under the Snapo Brand;

NOW, THEREFORE, in consideration of the following rights and obligations, the Parties agree as follows.

1. **One-Time Payment.** Licensee shall make a one-time payment to Licensor in the amount of $50,000 (the "Settlement Payment") by wire to The Frost Firm's IOLTA Trust Account fbo Carol Sorensen, or by certified check(s) payable to "The Frost Firm Trust Account, fbo Carol Sorensen" and addressed to The Frost Firm 110 West A Street, Suite 1100, San Diego, CA 92101. The Settlement Payment shall be paid in two equal installments, with the first being paid on or before August 31, 2019, and the second being paid on or before December 31, 2019. These obligations to make the Settlement Payment survive termination of this Agreement.

2. **Grant of Patent License.** In order to facilitate the sales of Licensed Products under the Brand License Grant, as those terms are defined below, Licensor hereby grants to Licensee an exclusive license in the United States, during the Term, to develop, make, produce, market, sell, offer for sale, use, import and distribute articles covered by one or more claims of one or more Licensed Patents and to practice any process or method covered by one or more claims of one or more Licensed Patents ("Patent License Grant"). The Patent License Grant shall not be revoked by Licensor at any time during the Term and is



C.S.

Scanned

revocable and terminates upon termination of this Agreement. "Licensed Patents" means each of the patents of the IP, and any patent that grants on application of the IP; any reissue or reexamination of any patent of the IP; any division, continuation, or continuation-in-part of any application of the IP; any application or patent from which priority is claimed by any application or patent of the IP; and any application or patent claiming priority to or through any of the foregoing. The Patent License Grant includes the right to sublicense these rights. The Patent License Grant is exclusive meaning Licensor agrees that Licensor, during the Term: (a) will not make, sell, offer for sale, use or import articles that are covered by one or more claims of one or more Licensed Patents, or practice any process or method covered by one or more claims of one or more Licensed Patents; and (b) will not license any other person or entity to make, sell, offer for sale, use or import articles covered by one or more claims of one or more Licensed Patents, or to practice any process or method covered by one or more claims of one or more Licensed Patents. Licensee shall mark all products that are covered by one or more claims of one or more Licensed Patents with an appropriate patent notice in accordance with any and all applicable patent marking laws.

3. **Grant of Brand License**. In conjunction with the Patent License Grant, Licensor hereby grants to Licensee an exclusive worldwide license, during the Term, to develop, make, produce, market, sell, offer for sale, use, export, import and distribute articles under the Snapo Brand ("Brand License Grant"); provided, however, that any use of any mark of the Snapo Brand and associated goodwill shall inure to the benefit of the Licensor and shall be subject to the review and approval and quality control of the Licensor, as provided herein. This Brand License Grant will not entitle Licensee to use the Snapo Brand marks for any purpose other than performing its rights and obligations under this Agreement. Licensee acknowledges the importance of maintaining high, uniform standards of quality in the provision, distribution and sale of the products that are licensed under this Agreement ("Licensed Products"). Licensee acknowledges and is familiar with the high standards, quality, style and image of the Snapo Brand ("Quality Standards"), and shall ensure that its use of the Licensed Products, as well as all promotional, packaging and advertising material relative thereto, will comply with those high standards, quality, style and image of the Snapo Brand. Licensor has the right to have Licensee's manufacturing facilities inspected for quality control purposes consistent with a reasonable quality associated with the Snapo Brand. Such reasonable right of inspection shall be no more than once per calendar quarter by a qualified representative of Licensor with reasonable advance notice to Licensee and at Licensor's expense. Licensee agrees that in the event it seeks to make any material change to the Licensed Products or to packaging relative thereto, it shall provide advanced written notice to Licensor of any such proposed material change (a "Proposed Change Notice"), including an appropriate sample of any change reasonably adequate for Licensor to assess the proposed material change. Any Proposed Change Notice shall be subject to Licensor's prior written consent, which consent shall not be unreasonably withheld; provided, however, that Licensor shall maintain the right in Licensor's sole discretion, to decline to approve any use of Snapo Brand marks on any products, for any service, or in copy or graphics that (i) is in violation of any applicable law, or (ii) Licensor reasonably determines disparages or otherwise harms the goodwill or value of the Snapo Brand. More specifically, Licensor shall have ten (10) business days from receipt of any Proposed Change Notice to provide licensee written notice of an objection to a proposed material change (an "Objection to Change Notice"), upon which the Parties shall work cooperatively in good faith to address the objection. Failure to timely provide a written Objection to Change Notice shall be deemed to be consent to any Proposed Change Notice. Otherwise, Licensor's Objection to Change Notice, if any, shall reasonably state the specific grounds of the objection so that Licensee may attempt to address the objection. In no event shall any Licensed Product or packaging relative thereof be sold under this Agreement that an ordinary purchaser would reasonably find disparages or otherwise harms the goodwill



C.J.

or value of the Snapo Brand. The Brand License Grant shall not be revoked by Licensor at any time during the Term and is revocable and terminates upon termination of this Agreement. The Brand License Grant includes the right to sublicense these rights; provided, however, that any use by a sublicense of any mark or trade dress of the Snapo Brand and associated goodwill shall inure to the benefit of the Licensor and shall be subject to the same quality standards and review and approval of the Licensor. The Brand License Grant is exclusive meaning Licensor agrees that Licensor, during the Term shall not use any mark or trade dress of the Snapo Brand or any confusingly similar brand, e.g. including the word "snap" in any manner in connection with toy products and any related goods or services. With the exception of Private Labeled Licensed Products, all Licensed Products made, sold or otherwise distributed by Licensee under this Agreement, including all packaging and promotional materials, shall carry any applicable registered mark followed by the ® symbol; and Licensee will comply strictly with the directions of Licensor regarding the form and manner of the application of the marks to the extent any such marking differs substantially from existing marking practices.

**A. Business Names and Domain Names**. Without Licensor's prior written consent, Licensee will not use a mark of the Snapo Brand (or any marks confusingly similar thereto), individually or in combination, as part of: (i) its corporate or trade name; or (ii) any domain name other than the Snapo.com domain name licensed to Licensee under this Agreement. Licensor also hereby licenses to Licensee on a royalty-free basis during the Term the right to use "SNAPO TOYS" in Licensee's entity name, Snapo Toys, LLC. Snapo, Snapo.com, Snapo Toys, LLC and Snapo Toys all are listed on the attached Schedule 1 which comprises the entirety of all currently approved "Licensed Trade Names" permitted for Licensee's use under the Agreement. The Parties may amend Schedule 1, from time to time, to include additional Snapo Brand trade names, domain names, and related uses of the Snapo Brand trademark expressly licensed to Licensee or a sublicensee for use under this Agreement, subject in every case to Licensor's prior written consent, which consent shall not be unreasonably withheld.

**B. Sublicensee's Use of Snapo Brand Trade Names.** Licensee may grant to each sublicensee a sublicense to use a name solely in the form set forth on Schedule 1 as amended from time to time by mutual agreement of Licensor and Licensee and solely in connection with operation of sublicensee's sublicense to sell toys and related goods under the Brand License Grant and Patent License Grant. The grant of any sublicense hereunder shall be conditioned on such sublicensee having first executed a copy of a written sublicense agreement subject to Licensor's prior written approval. Any such sublicense shall be made on, and subject to, all applicable terms and conditions of this Agreement with respect to the Licensed Products, including but not limited to the following:

(i) Any such sublicense shall contain a provision that the sublicense will, at Licensor's choice, either (a) be deemed automatically assigned by Licensee to Licensor or (b) terminate automatically upon any termination of this Agreement.

(ii) Licensee shall (a) notify Licensor promptly in writing upon becoming aware of any deviation in Licensed Products by a sublicensee from the Quality Standards in any material respect, and (b) promptly undertake commercially reasonable efforts to cause such defective or nonconforming use to be cured or, if not curable, discontinued.

(iii) Licensor shall be a third-party beneficiary of such sublicense.

(iv) Licensor shall have the right to enforce the terms and conditions of, and terminate, such sublicense, whether as a party thereto or as a third-party beneficiary, under all of the same circumstances as provided for termination hereunder.



C.S.

(v) Notwithstanding anything to the contrary anywhere in this Agreement, the Parties expressly agree, understand and acknowledge that no sublicensee, reseller or distributor shall ever be permitted to sublicense to any other person or entity any rights granted under this Agreement.

4. **No Unbranded Related Products.** During the Term, Licensee agrees not to manufacture or market, or cause or induce others to manufacture or market, any interlocking toy building elements other than those that are manufactured by Licensee and sold under the Snapo Brand pursuant to the Brand License Grant. For a period of one (1) year following the termination of the Agreement, Licensee agrees not to use any trade dress, or cause or induce others to use any trade dress that is confusingly similar to any trade dress of the Snapo Brand. Notwithstanding the foregoing, during the Term Licensee may sell to a third-party, other than any of the Licensee Group, Licensed Products that are private labeled by or for such third-party ("Private Labeled Licensed Products"), provided that Licensor receives a Royalty, as defined below and as otherwise associated with a branded/"non-private labeled" Licensed Products, and subject to Licensor's prior written consent which shall not be unreasonably withheld. Licensee undertakes not to cause or permit the reverse engineering, disassembly, or decompilation of the Licensed Products or related trade secrets except to produce molds to facilitate Licensee's manufacturing volume and/or for new releases of Licensed Products with Licensor's consent, if any, pursuant to Section 3. Additionally, no less than sixty (60) days prior to any such production of molds to facilitate growth, Licensee agrees to notify Licensor and provide Licensor the option to pay for all costs to be charged by Innovative Tool & Die Inc. or a reasonably comparable and equally skilled tooling facility agreed to by the Parties (the "Tooling Facility") to produce and provide the complete molds for Licensee's testing and finish work onsite (or other production as the case may be) (the "Quote"). In all cases, however, Licensee shall cover its costs for onsite testing, fine-tuning and/or other finish work reasonably required and/or recommended by the Tooling Facility prior to utilizing molds for manufacturing goods under this Agreement. Upon such notice, Licensor shall have the option, exercisable within ten (10) days thereafter, to assume and pay for the cost of such productions. In the event Licensor exercises such option to produce the molds, (i) Licensor shall immediately accept the Quote and provide the Tooling Facility instructions for timely delivery of the complete mold(s) to Licensee's designated location; (ii) Licensor shall dedicate such time and provide such cooperation to the Tooling Facility as is necessary and appropriate, in accordance with the usual and customary practices and reasonably expected timeframes in the tooling industry, to ensure timely completion of the molds ordered by Licensee; and (iii) Licensor shall timely pay all invoices issued by the Tooling Facility to create the complete mold(s) for delivery to Licensee in accordance with the Quote. Upon exercise of the foregoing option and payment therefor, the molds produced hereunder shall be deemed "Sorensen Molds" for all purposes herein. Licensee shall maintain property insurance that covers the Sorensen Molds with Licensor named as an additional insured for the Sorensen Molds.

5. **Royalty.** Licensee shall make quarterly payments to Licensor as a royalty ("Royalty") in an amount equal to FIVE percent (5.00%) of Net Receipts for Licensed Products. Royalty payments shall be due no more than thirty (30) days after the end of each calendar quarter, and shall be accompanied with a detailed report setting forth all of the information reasonably required to calculate any and all components of all Royalty payments, including all provisions pertaining to Royalty calculations expressly set forth in this Section 5 (a "Royalty Report"). "Licensed Products" means a product that is sold by Licensee or a sublicensee under the Brand License Grant, the sale of which would otherwise be a trademark or trade dress infringement but for this Agreement; additionally, in order to facilitate sale of products under the Brand License Grant hereunder, Licensed Products necessarily include those products sold by Licensee or a sublicensee covered by one or more claims of one or more Licensed Patents, the



C.S.

manufacture, offer for sale, sale, or importing of which product would otherwise be a patent infringement but for this Agreement. "Net Receipts" means the gross total of any and all fees, monies, and other monetary consideration that is received by Licensee or a sublicensee in a calendar quarter that arises from or relates to sales of Licensed Products, less any documented actual returns and documented allowances of Licensed Products actually given in the ordinary course of business, and less all documented freight, shipping costs, third-party commissions, and sales, customs, and retail taxes, if, as and when incurred and/or paid by Licensee or a sublicensee where applicable (collectively, the "Deducted Amounts"). Royalties paid for Licensed Products that are returned for refund or bought back as part of a buyback shall result in a credit against Royalties equal to 5% of the refund or buyback amount. Returns, buybacks or rejections of Licensed Products which result in a negative Royalty balance will be carried forward as a credit against future Royalties. Credit against future Royalties will in no way cause Licensor from receiving less than the applicable minimum quarterly royalty threshold set forth in the attached Minimum Quarterly Royalty Threshold Schedule. For the avoidance of doubt, no costs otherwise incurred in the manufacturing, sale, marketing, advertising or distribution of the Licensed Products shall be deducted from any Royalty nor from "Net Receipts" to arrive at a Royalty payment. Additionally, no items of costs otherwise characterized as Deducted Amounts but which regularly are repaid in the ordinary course of business at any time to the Licensee Group, any sublicensee, or any of their respective affiliates, directly or indirectly, shall be deducted from any Royalty nor from Net Receipts to arrive at a Royalty payment. All Royalties, once paid, are non-refundable, and in no event shall Licensor be required to repay any amount of a Royalty paid to Licensor due to returns, buybacks or rejections of Licensed Products other than as expressly provided herein. Licensee and each sublicensee will keep detailed itemized records of any and all Deducted Amounts (referencing for example item# and/or Sku) sufficient to establish whether and when any Licensed Products returned were in fact re-sold at a later date (a "Resale Items"), and provide Licensor all such record within or appended to all Royalty Reports. To the extent a Royalty is reduced by Deducted Amounts which later are recouped on Resale Items, that portion of the Royalty withheld shall be paid to the extent recouped if, as and when such Deducted Amounts are recouped upon sales of Resale Items. Licensee agrees that for purposes of the Royalty, all sales of Licensed Products shall be negotiated at arms-length and for good faith consideration with Licensee's customers, including but not limited to the Licensee Group, and that Licensee will not provide product "on consignment" to customers. Licensee Group shall not receive preferential pricing better than the six (6) months average sales pricing for any given product, or at Licensee's discretion, sales to any of the Licensee Group shall be at pass-through pricing (i.e., the same pricing bought and sold by any of the Licensee Group within the Licensee Group). Licensee shall have an initial $7,500 credit toward Royalties due.

A. **Royalty Payments for Brand License Grant and Patent License Grant.** The Parties and their respective intellectual property licensing professionals evaluated the separate and distinct values of the Brand License Grant and the Patent License Grant, respectively, as contemplated under this Agreement, for purposes of assigning a reasonable and appropriate Royalty for each throughout the Term. After evaluating all available information to their mutual satisfaction, specifically including the historical sales and related performance metrics, the Parties hereby acknowledge and agree that the value of the Brand License Grant will increase throughout the Term sufficiently to compensate Licensee for the decreasing value of the Patent License Grant, as the statutory terms of the Licensed Patents lapse. More specifically, the portion of the Royalty Payment the Parties assigned to the Patent License Grant will diminish slowly throughout the term, particularly given the ongoing vitality of the technologies and related trade secrets included in the Patent License Grant, such that the 5% Royalty is deemed sufficient for the Brand License Grant only.



C.S.

B. **Bundling Royalty.** Licensee shall not have the right to distribute, market or sell (or authorize a third party to distribute, market or sell) any Licensed Product with any other product, good or article (other than another Licensed Product) in a single package at a single price ("Bundling") without Licensor's prior written approval of: (a) whether or not such Bundling may occur; (b) the terms and conditions of such Bundling; and (c) Licensor's Royalty in such instance.

C. **Sublicense Royalties.** Under any and all sublicense agreements, which shall be subject to prior written approval of Licensor that shall not be unreasonably withheld, Licensee shall pay royalties to Licensor for sales by a sublicensee as if such sales were by Licensee.

6. **Minimum Quarterly Royalty Threshold Requirement.** Each Royalty that is paid shall be no less than the applicable minimum quarterly royalty threshold set forth in the attached Minimum Quarterly Royalty Threshold Schedule. If the calculated Royalty for a particular calendar quarter is less than the minimum quarterly royalty threshold set forth in this schedule, then Licensee shall have the right to pay up the amount of the Royalty to equal the minimum quarterly royalty threshold for such calendar quarter. Failure to timely pay a Royalty for a calendar quarter that is not at least as much as the minimum quarterly royalty threshold for such calendar quarter is a breach by Licensee of this Agreement.

7. **Records.** Licensee shall keep true and accurate records as to all Licensed Products sold by it and its sublicensees. At most once a year Licensor, through an independent, designated representative acceptable to Licensee, shall have the right to inspect and audit, at reasonable times and upon reasonable advance notice, Licensee's records at Licensor's expense for the purpose of verifying the accuracy of any payment of a Royalty and statement furnished to Licensor by Licensee. Any sublicensee of Licensee also shall keep true and accurate records as to all Licensed Products sold by such sublicensee, and at most once a year Licensee and Licensor acting together shall have the right, through an independent, designated representative selected by Licensee, to inspect and audit, at reasonable times and upon reasonable advance notice, the records of sublicensee at the expense of Licensee for the purpose of verifying the accuracy of any payment of a Royalty and statement furnished to Licensee.

8. **IP Protection and Trademark Maintenance.** Without any admission of liability, the Licensee Group acknowledges that Licensor is the owner of all right, title and interest in and to the IP and of the goodwill attached to the IP. During the Term, Licensee shall not challenge Licensor's ownership of or the validity of the IP or any application for registration for the mark Snapo, and Licensee shall not, in any manner, knowingly or intentionally, engage in any activity which may adversely affect any rights of Licensor in and to the IP or applications or registrations thereof. Licensor shall defend and maintain the Snapo Trademark Registration during the Term, including renewing the Snapo Trademark Registration when due. If Licensee becomes aware that the Snapo Trademark Registration is not timely renewed or made incontestable, upon being notified Licensor shall immediately renew and apply for incontestability, or if unavailable file a new application and take reasonable actions to get the Snapo Mark registered again. During any period of time that Licensor does not have an active U.S. trademark registration for Snapo for toy building blocks, royalties due for Licensed Products sold during such period of time shall be reduced 50%.

9. **Litigation**. Each Party shall promptly notify the other Party of any suspected infringement of any of the IP or of the Snapo Brand by a third party and the Parties shall work together in the investigation



C. J.

thereof. As between the Parties, Licensor has the initial exclusive right for three (3) months from notice of said suspected infringement being sent from one to the other Party, but not the obligation, to file suit against or otherwise pursue any third parties for infringement of any of the IP. If Licensor waives the right to file suit, or does not exercise the exclusive right within three months, Licensee may file suit against or otherwise pursue any third parties for infringement, and Licensor agrees to assist Licensee, at Licensee's sole expense and at Licensee's direction, in such endeavor, including joining such suit or even bringing such suit if there is any question whether Licensee has legal standing. Any and all recoveries from any such suit so brought by Licensor shall go to Licensor until Licensor has recovered its litigation costs, including attorney fees and expenses, and then shall be split between the Licensee and Licensor. Any and all recoveries from any such suit so brought by Licensee shall go to Licensee until Licensee has recovered its litigation costs, including attorney fees and expenses, and then 5% of any remaining recovery shall go to Licensor and 95% shall go to Licensee. Any settlement of a lawsuit for infringement of any of the IP or the Snapo Brand must be agreed to by the Parties participating in the litigation, such agreement not to be unreasonably withheld.

10. **Natural Termination.** The natural term of the Agreement ("Term") commences on the Effective Date and continues until July 31, 2022. Provided that this Agreement is in effect on the last day of the Term, and that notice of nonrenewal has not been provided by Licensee to Licensor prior to ninety (90) days before the last day of the Term, then this Agreement shall be automatically renewed for a one year period which one year period shall be deemed to be part of the Term. If such notice of nonrenewal is timely provided by Licensee to Licensor, then this Agreement shall naturally terminate at the end of the Term ("Natural Termination").

11. **Early Termination.** Licensor has the right to immediately terminate this Agreement if Licensee is the subject of insolvency, dissolution, bankruptcy, or receivership proceedings ("Early Termination by Licensor"), and Licensor has the right to refuse to accept substitute performance from any entity other than Licensee in the event of such proceedings. Licensee has the right to terminate this Agreement with ninety (90) days' prior written notice to Licensor ("Early Termination by Licensee").

12. **Termination for Breach.** In the event of breach by either Party, the breaching Party shall have ninety (90) days from the time of written notice from the non-breaching Party to cure the breach to the reasonable satisfaction of the non-breaching Party. If the breaching Party fails to cure the breach to the reasonable satisfaction of the non-breaching Party during said ninety (90) day period, then the Parties shall meet and confer in good faith to attempt to amicably resolve their dispute for an additional fifteen (15) day period; and if such good faith efforts are unsuccessful, this Agreement shall automatically terminate early at the end of said fifteen (15) day period ("Termination for Breach"). Upon such termination for a breach by Licensee that is not cured, Licensee shall be permitted sixty (60) days after the date of the termination for breach: to perform such actions, under the terms of this Agreement, and to the extent necessary, in order to fulfill any legal obligations to third parties that are existing at the time of the date of termination for breach; and, to selloff under the terms of this Agreement any and all Licensed Products in its possession, custody, or control, or in transit. Within ninety (90) days Licensee shall provide a complete accounting of all such Licensed Products in its possession, custody, or control, or in transit.

13. **Efforts by Licensee.** Licensee shall use commercially reasonable efforts to promote, sell and expand the supply and sales of interlocking toy building elements of the IP and related accessories of the



C.S.

IP pursuant to the Brand License Grant. Licensee has sole discretion to determine which of the interlocking toy building elements and related accessories of the IP to sell or not to sell.

14. **Made in the USA.** Molds purchased from Vision used to make interlocking toy building elements of the IP ("Snapo Molds") shall be used by Licensee to make such elements only within the continental United States. The Snapo Molds further are defined to include those molds shown in their current physical condition in the photographic listing of the attached Schedule of Molds Received from Vision, which molds were physically received by Snapo Toys from Vision and currently are located in Pennsylvania. Specifically excluded from being Snapo Molds are the "32 mm propeller mold (1 cavity insert)" identified by Innovative Tool & Die Inc.'s job #136640 and the "32 mm large wheel (2 cavity insert)" identified by Innovative Tool & Die Inc.'s job #136649 ("Sorensen Molds"). The Sorensen Molds shall also include the two additional molds presently in the possession of Innovative Tool & Die Inc., which may be identified as the "16 mm single axle (4 cavity insert)" identified by Innovative Tool & Die Inc.'s job #136045 and the "16 mm double axle (4 cavity insert)" identified by Innovative Tool & Die Inc.'s job #137304. During the Term, Licensee shall have the exclusive right to the Sorensen Molds for making the 32 mm propellers and 32 mm wheels, subject to the terms and conditions of this Agreement. Upon termination of this Agreement whether natural or for cause, Licensor shall have the right at Licensor's expense to take possession of the Sorensen Molds as the owner of those molds.

15. **Rights of First Refusal.** Licensor shall have the right of first refusal ("Rights of First Refusal") to buy (A) the Snapo Molds for $100,000 upon the occurrence of any of: (1) Licensee ceasing normal operations; (2) electing by Licensee to otherwise dispose of any of the Snapo Molds; or (3) filing for bankruptcy or going into receivership; and (B) for each one of the four Netstall DIS 60 injection-molding machines ("Machines"), each Machine for $6,000 upon the occurrence of any of: (1) Licensee ceasing normal operations; (2) electing by Licensee to otherwise dispose of the Machine; or (3) filing for bankruptcy or going into receivership. Such Rights of First Refusal shall survive termination of this Agreement for a period of twenty-five years only upon Termination for Breach based on an uncured breach by Licensor.

16. **Option to Buy Snapo Molds and Machines.** Upon any termination of this Agreement except Termination for Breach based on an uncured breach by Licensor, Licensor shall have an option to purchase the Snapo Molds for a total of $100,000 and each of the Machines for $6,000 each. Such option shall become exercisable on the day following termination of this Agreement and shall expire ninety (90) days after receipt by Licensee of notice of such termination. Licensor may exercise the option by both noticing Licensee of the exercise of the option and providing payment in accordance therewith within the option period, with Licensor to take delivery at Licensee's location and at Licensor's expense within the option period.

17. **Conduct After Term.** Licensee Group agrees that it will not for a period of two years following any termination of this Agreement, within any market in which Licensee sold or offered for sale Licensed Products under the Brand License Grant: (a) manufacture or produce, or have manufactured or produced, any interconnecting toy building elements that have the same characteristics of visual appearance as any said Licensed Product, or packaging of any such Licensed Product, which characteristics of visual appearance consumers have come to associate with the Snapo brand; or (b) take any action or make any representation indicating that such action or representation is under any license agreement with Licensor

C.S.

or otherwise is authorized by Licensor. Nothing in this section shall be interpreted as granting any license right, consent, or permission whatsoever for any time in any market.

18. **Licensor Representations and Warranties.** LICENSOR REPRESENTS AND WARRANTS THAT LICENSOR HAS THE AUTHORITY TO MAKE THE PATENT LICENSE GRANT AND THE BRAND LICENSE GRANT, AND TO ENTER INTO THIS AGREEMENT; THAT LICENSOR IS THE SOLE OWNER OF ALL RIGHTS, TITLE, AND INTERESTS IN, TO, AND UNDER ALL OF THE IP LICENSED UNDER THIS AGREEMENT; AND THAT LICENSOR WILL NOT KNOWINGLY TAKE ANY ACTION THAT IS CONTRARY TO OR IN CONFLICT WITH EITHER THE PATENT LICENSE GRANT AND THE BRAND LICENSE GRANT.

19. **Licensee Representations and Warranties.** LICENSEE REPRESENTS AND WARRANTS THAT IT IS A LIMITED LIABILITY COMPANY ORGANIZED IN PENNSYLVANIA, THAT IT IS IN GOOD STANDING, AND THAT IT HAS THE AUTHORITY TO ENTER INTO THIS AGREEMENT; AND THAT IT WILL NOT HARM OR MISUSE THE SNAPO BRAND OR BRING THE LICENSED PRODUCTS INTO DISREPUTE; AND THAT IT WILL COMPLY IN ALL MATERIAL RESPECTS WITH ALL LAWS AND REGULATIONS RELATING OR PERTAINING TO THE MANUFACTURE, PRODUCTION, DISTRIBUTION, SALE, CONSUMER MARKETING AND USE OF THE SNAPO BRAND AND LICENSED PRODUCTS.

20. **Indemnification**. Each Party shall indemnify, defend and hold harmless the other Party from any damage, harm, injury, loss, claim, suit or liability arising out of a breach of a representation or warranty by the indemnifying Party. The indemnification obligations of the Parties survive termination of this Agreement.

21. **Severability**. If any portion of this Agreement is in conflict with any applicable statute or rule of law, then such portion shall be deemed inoperative to the extent of such conflict and shall be deemed to be modified to conform with such statue or rule of law, and the remaining portions hereof shall remain in full force and effect.

22. **Waiver**. Any waiver must be made explicitly in writing. A waiver of any breach of or failure to enforce any of the terms and conditions of this Agreement shall not in any way effect, limit, or waive a Party's rights to enforce strict compliance with such terms and conditions thereafter, nor effect, limit, or waive in any way a Party's rights to enforce strict compliance at any time with any other terms or conditions.

23. **Notice**. Any notice under this Agreement, and any payment of a Royalty and statement, shall be sent by email and by Federal Express or by U.S. Priority Mail or by other internationally recognized commercial courier to a Party's address below, with email or mail copies sent to counsel as provided below, and shall be effective upon receipt of such notice by the Party provided there is a tracking receipt or other evidence sufficient to ensure delivery. A Party's address also shall be updated by such notice.

<u>To Licensor</u>:
Attn: Carol Sorensen
carolsorensen1@yahoo.com
PO Box 31096

C.S.

Grand Cayman
Cayman Islands
KY1-1205

And with Copies To:
Thomas C. Frost
tfrost@thefrostfirm.com
The Frost Firm
110 West A Street, Suite 1100
San Diego, CA 92101

Ed Callan
ecallan1@san.rr.com
3830 Valley Centre Dr, Suite 705
San Diego, CA 92130

To Licensee:
Tara Kennedy-Kline
Tara@TKsToyBox.com
105 W 9th St.
Shoemakersville, PA 19555

With a Copy To:
Chad D. Tillman
TILLMAN WRIGHT, PLLC
chad@ti-law.com
P.O. Box 49309
Charlotte, NC 28277

**24. Assignment.** This Agreement may be assigned by a Party to a third party only upon the prior written consent of the other Party, which consent shall not be unreasonably withheld. Such assignee shall become and stand in the shoes of the Party making the assignment and shall assume the obligations of and enjoy the rights provided by this Agreement. An assignment from Licensor to a trust or similar instrument to the benefit of a child, grandchild or spouse of Licensor, for which trust Licensor is the trustee, or an assignment through inheritance, is permitted provided that timely notice thereof is provided to the other Party, and provided any such assignee(s) first expressly acknowledges in a signed writing that it/he/she/they duly assume and are bound by all of the terms and conditions set forth in this Agreement.

**25. Change in Control.** If applicable to a Party, a change in control of a Party resulting from a transfer or sale of more than fifty percent stock ownership or membership interest in a Party, in terms of the aggregate post-transfer holdings of any transferor or transferee, is subject to the consent of the other Party, which consent shall not be unreasonably withheld.

**26. Settlement; Dismissal.** Upon execution of this Agreement, the Parties shall notify the Court that a settlement in principle has been reached by the Parties, and a binding licensing agreement duly has been



C.S.

executed between and among the Parties, and that the Parties reasonably expect to submit a stipulation regarding dismissals within ninety (90) days thereafter. The Parties furthermore agree to work together in good faith to enter a global settlement of their claims between and among the Parties and Vision and the other remaining parties to the Action. Within seven (7) days of executing a written settlement of their claims with Vision, et al., the Parties will cause the Action to be dismissed in its entirety as to all parties and all causes of action.

27. **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of Pennsylvania without reference to conflict-of-laws or choice-of-laws principles.

28. **Arbitration.** Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in the state of Pennsylvania, or other location agreed to by the Parties, and conducted pursuant to the American Arbitration Association under its Commercial Arbitration Rules. Any decision or award as a result of any such arbitration proceeding shall be in writing and shall provide an explanation for all conclusions of law and fact and shall include the assessment of costs, expenses, and reasonable attorneys' fees. Any arbitrator conducting such arbitration shall be experienced in intellectual property law and commercial licensing agreements. An award of arbitration may be confirmed in and enforced by any court of competent jurisdiction.

29. **Relationships of Parties**. This Agreement does not constitute and shall not be construed as constituting a partnership or joint venture between Licensor and Licensee or as making either Party an agent or representative of the other. Neither Party shall have the right to obligate or bind the other Party in any manner whatsoever with respect to any third party and nothing contained in this Agreement shall give or is intended to give any right of any kind to any third party. There are no third-party beneficiaries of this Agreement.

30. **Entire Agreement**. This Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof and supersedes any and all previous writings and understandings. Nothing herein shall be altered by any prior or subsequent statement, conduct, or act of a Party. This Agreement can only be changed by a subsequent document that is signed by each of the Parties.

31. **Force Majeure**. Notwithstanding anything else in this Agreement, no default, delay, or failure to perform on the part of any Party shall be considered a breach of this Agreement if such default, delay, or failure to perform is shown to be due to causes beyond the reasonable control of the Party charged with a default, including, but not limited to, causes such as strikes, lockouts, or other labor disputes, riots, civil disturbances, actions or inactions of governmental authorities or suppliers, epidemics, war, embargoes, severe weather, fire, earthquakes, acts of God or the public enemy, nuclear disasters, or default of a common carrier.

32. **Release of Licensee Claims.** In consideration of the rights and obligations arising hereunder, Licensee and its respective present and former parents, subsidiaries, affiliates, employees, officers, directors, members, agents, and representatives, including Multi-Level Mom, LLC and Tara Kennedy-Kline ("Licensee Group") hereby voluntarily, expressly, and irrevocably waive and release each of the Licensor Group of and from any and all actions, causes of action, suits, losses, liabilities, damages, claims and demands, whether now known or unknown, foreseen or unforeseen, matured or un-matured, suspected or unsuspected, and in law or in equity ("Licensee Claims"), arising at any time between the beginning of



C.S.

time and the day immediately prior to the Effective Date of this Agreement. The release by Licensee and the Licensee Group survives termination of this Agreement.

33. **Release of Licensor Claims.** In consideration of the rights and obligations arising hereunder, Licensor and the Estate of Soren Christian Sorensen ("Licensor Group") hereby voluntarily, expressly, and irrevocably waives and releases each of the Licensee Group of and from any and all actions, causes of action, suits, losses, liabilities, damages, claims and demands, whether now known or unknown, foreseen or unforeseen, matured or un-matured, suspected or unsuspected, and in law or in equity ("Licensor Claims"), arising at any time between the beginning of time and the day immediately prior to the Effective Date of this Agreement. The release by Licensor survives termination of this Agreement.

34. **Section 1542.** Each Party (including all members of the Licensee Group) understands and agrees that the releases set forth above extend to any and all claims described above of every nature and kind whatsoever and that any and all rights that may exist under Section 1542 of the California Civil Code ("Section 1542") within the scope of the release set forth above are voluntarily, expressly, and irrevocably waived. Each Party expressly acknowledges having read Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER, MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Each Party understands and agrees that Section 1542, if applicable herein, gives such Party the right not to release existing claims of which it is not now aware of and does not suspect to exist, unless such Party voluntarily chooses to waive this right. With this understanding, each Party nevertheless hereby voluntarily, expressly, and irrevocably waives the right described in Section 1542 and voluntarily, expressly, and irrevocably waives any right under any other statute or common law principle of similar effect. This provision relating to Section 1542 survives termination of this Agreement

35. **Unreleased Claims.** Notwithstanding anything to the contrary herein, the Parties agree that the release of Claims herein shall not extend to any claims arising from the breach by any Party of its obligations under this Agreement, and nothing in this Agreement shall be construed as preventing a Party from bringing an action against any other Party with respect to the enforcement of the provisions of this Agreement or with respect to the breach thereof by any of the Parties.

36. **Confidentiality**. The Parties agree that all terms and provisions of this Agreement, its negotiation, and any discussions or agreements related thereto ("Confidential Information"), shall be held strictly confidential by the Parties, provided, however, that in response to a direct question concerning the Agreement by anyone not a party to this Agreement, a party may respond by stating, *in haec verba*, that this lawsuit "was resolved to the mutual satisfaction of the parties." Notwithstanding the above, Confidential Information may be disclosed solely in the following circumstances: (i) to the extent necessary to comply with law or as required by a judicial body, or arbitrator, or federal/state government, in which event, to the extent permitted by applicable law, the disclosing Party shall so notify the other Party in writing as promptly as practicable (and, in any event, prior to making any disclosure) and shall cooperate with the other Party to seek to limit the scope of such disclosure and/or to make such disclosure



C.S.

subject to a protective order or similar device, provided that in all events the disclosing Party shall seek confidential treatment of such Confidential Information (including by redacting any documents containing Confidential Information such as this Agreement to the greatest extent possible); (ii) to the Party's Affiliates, its auditors and its attorneys as part of its normal reporting or review procedures and such auditors and attorneys agree to be bound by the confidentiality obligation created by this section; (iii) to potential investors, purchasers, insurers or financing entities provided however, that such person described above agrees to be bound by the provisions of this Section.

37. **Assets Acquired from Vision.** Licensor agrees to reasonably cooperate and assist Licensee with—and otherwise facilitate where possible in—the delivery of the assets of Vision to Licensee. Consistent with and subject to the terms and conditions of this Agreement, Licensor shall pay for and grant Licensee administrative access to the domain name registration snapo.com and any other domain name associated with the goodwill of the Snapo Brand owned or controlled by Licensor and set forth on Schedule 1 hereto, as amended from time to time as the case may be ("Registrations"), and to the extent owned or under the control of Licensor, Licensor further shall pay for and grant administrative access to Licensee to each of the following accounts for the duration of the Agreement: the website hosting account associated with snapo.com; and the email hosting account associated with snapo.com. To the extent owned or under the control of Licensor, Licensor shall grant Licensee administrative access to each of the following accounts: the Twitter social media account associated with the Snapo Brand; the Pinterest social media account associated with the Snapo Brand; the Instagram social media account associated with the Snapo Brand; the LinkedIn social media account associated with the Snapo Brand; the YouTube social media account associated with the Snapo Brand; and the Grasshopper virtual phone service associated with Snapo.

38. **Assisting in Claims Against Vision.** Nothing herein shall affect, compromise, waive, or alter any claim, right, or cause of action that a Party may have against Vision or any of Vision's directors, officers, and shareholders (with the exception of those claims waived and released against Licensor). To the extent necessary and when reasonably requested, and at the sole expense of and request by a Party, the other Party shall cooperate and assist the requesting Party in bringing any such claim, right, or cause of action so long as such cooperation and assistance is within the bounds of applicable law.

[Signature Page Follows]



C.S.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be signed under seal.

| | |
|---|---|
| On behalf of Snapo Toys, LLC and the Licensee Group<br><br>By: [signature] (seal)<br><br>Name: Tara Kennedy-Kline<br><br>Title: Manager, Snapo Toys, LLC<br>Manager, Multi-Level Mom, LLC, as part of Licensee Group<br>Tara personally, as part of Licensee Group<br><br>Date: June 15, 2019 | ______________________________(seal)<br><br>Carol Sorensen, individually and on behalf of the Estate of Soren Christian Sorensen<br><br>Date: ______________________________ |

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be signed under seal.

| On behalf of Snapo Toys, LLC and the Licensee Group | |
| --- | --- |
| By: ______________________(seal) | Carol Sorensen ______________________(seal) |
| Name: ______________________ | Carol Sorensen, individually and on behalf of the Estate of Soren Christian Sorensen |
| Title: ______________________ | Date: June 17, 2019 |
| Date: ______________________ | |